IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOE BILLY SMITH                                                                                        PLAINTIFF

v.                                            Civil No. 5:21-cv-05003

LIEUTENANT AMANDA ARNOLD; and                                                          DEFENDANTS
DEPUTY TOM MULVANEY

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by Joe B. Smith ("Smith") pursuant to 42 U.S.C. § 1983. Smith proceeds *pro se* and *in forma pauperis*. Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable P.K. Holmes, III, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation on a Motion for Summary Judgment (ECF No. 20) filed by the Defendants. Smith filed a timely Response (ECF No. 24).

Smith contends his constitutional rights were violated while he was incarcerated at the Washington County Detention Center ("WCDC").[1] Smith asserts two separate claims against Lieutenant Arnold and Corporal Mulvaney in relation to his removal from W-block on December 15, 2020.[2] First, he contends he was subjected to unconstitutional conditions of confinement when he was moved from an open barracks to administrative segregation. Second, he maintains he was denied due process in connection with his movement from a general population cell into administrative segregation.

---

[1] Smith is now incarcerated in the Tucker Unit of the Arkansas Division of Correction ("ADC"). Smith's requests for injunctive relief were mooted by his transfer to the ADC. *See e.g., Walker v. Bowersox,* 526 F.3d 1186, 1189 (8th Cir. 2008).

[2] Smith has sued the Defendants in both their individual and official capacities.

1

# I.  BACKGROUND

Smith was booked into the WCDC on July 12, 2019.  (ECF No. 22-2 at 2).  Smith was a pretrial detainee until June 22, 2020.  (ECF No. 22-2 at 3-5).  On December 15, 2020, Smith was in convicted status.

During a majority of Smith's incarceration in the WCDC, a world-wide pandemic existed. On January 31, 2020, the Secretary of Health and Human Services determined that a national public health emergency existed as a result of confirmed cases of "2019 Novel Coronavirus."[3] On March 11, 2020, the World Health Organization declared COVID-19 to be a world-wide pandemic.[4]  On March 11, 2020, Governor Asa Hutchinson, by executive order, declared a state of emergency due to COVID-19.[5]  Beginning March 13, 2020, the WCDC implemented screening, detection, and prevention measures aimed at identifying and treating any persons in the facility affected by COVID-19.  (ECF No. 22-1 at 5, ¶ 24).

Beginning the day he was booked into the WCDC, Smith submitted a series of medical requests indicating that he was diabetic, had back problems, and needed access to his inhaler because he had chronic obstructive pulmonary disease ("COPD").  (ECF No. 22-4).  Smith indicated his back problems had been long standing and he had used narcotic pain medication for chronic pain. (ECF No. 22-4 at 1).  A variety of medications were prescribed to assist Smith with the chronic pain; he was authorized to have a second blanket; he was given a bottom bunk restriction; and he was provided a soft back brace.  *Id.* at 1, 13, 17-18, 25, 32, 47.

On December 29, 2020, Smith complained that sleeping on the floor under another man's bunk had made his back worse and bothered his knee.  *Id.* at 40.  Similarly, Smith submitted a

---

[3] https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (accessed August 12, 2021).
[4] https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed August 12, 2021).
[5] https://governor.arkansas.gov/our-office/executive-orders/P60 (accessed August 12, 2021).

number of grievances about the conditions in the housing units he was assigned to. (ECF No. 22-3 (grievances)). His complaints encompassed a variety of conditions including cold temperatures, the contents of the book cart, not receiving yard call on a daily basis, condensation on the walls allowing "black" mold to grow, yard call occurring when it was below 32 degrees Fahrenheit, no television in certain blocks, and the lack of privileges in certain blocks. *Id.* at 3-4, 5, 7, 9, 11, 18, 24, 27, 33. Smith repeatedly voiced his displeasure with the conduct of detention center personnel including their perceived prejudice against sex offenders. *Id.* at 5, 7, 11, 13, 17,18, 33.

On December 15, 2020, six inmates filed grievances asking for Smith to be removed from his assigned barrack for stealing, trying to start fights, and in general causing problems. (ECF No. 22-5 at 2); (ECF No. 22-8 at 1-6 (inmate grievances)). The inmates also indicated that something was going to be done about Smith if he was not removed. *Id.* At the time, Smith was in W-block. (ECF No. 22-10 at 6). W-block was an open barrack. *Id.*

Corporal Carpenter and Deputy Self reported they moved Smith to holding cell three ("HC3") for his own safety as no other non-quarantine cell was available for him. (ECF No. 22-5 at 2. Smith remained in this cell approximately two hours. (ECF No. 22-10 at 6). Smith was then moved to HC4 which was a smaller cell since he was housed by himself and in order to maximize available space in booking. (ECF No. 22-5 at 5). A cursory cleaning was done removing trash and other items from the cell since the officers were about to distribute meals. *Id.* Cleaning supplies were provided after each meal. *Id.* Smith objected to being moved to a cell which may have been occupied by incoming detainees with COVID-19. *Id.* Smith demanded, and was supplied with, cleaning supplies. *Id.* Deputy Weaver reported Smith had an aggressive attitude with Deputies Hejl and Edge and as a result Deputy Weaver "stood by and helped clean [Smith's] cell." *Id.* at 6. Smith remained in HC4 for one to two hours and then was

moved down to S23.[6] (ECF No. 22-10 at 6). Smith voiced no objections to the conditions in S23. He remained there for two to three days and then was moved to P11.[7] *Id.* In P11, Smith was locked-down twenty-three hours a day. *Id.* Smith remained in P11 for approximately two months. *Id.* at 8. Smith testified during his deposition that for over a month he slept on the floor partially under another man's bunk because of the lack of space.[8] *Id.*

On December 16, 2020, Smith submitted a grievance noting that Lieutenant Arnold stated he was moved because his life had been threatened. (ECF No. 22-3 at 35). Smith maintained that the inmates who threatened him should have been moved. *Id.* Smith believed Lieutenant Arnold had taken the opportunity to retaliate again him "because she has an agenda against me." *Id.* Smith complained he had been taken to booking and placed in a "very nasty cell[9]" which caused him to throw "a hissy fit." *Id.* After he "threw a fit," Smith states he was then put in the hole. *Id.* at 38. Smith stated he wanted to press terroristic threatening charges against the inmates who threatened him. *Id.* at 35. He indicated he wanted to return to W-block where he had privileges. *Id.* Smith also voiced his belief that the jailers were prejudiced against him. *Id.*

By affidavit, Corporal Mulvaney asserts that he was not involved in the decision to move Smith on December 15, 2020. (ECF No. 22-1 at 1, ¶ 6). When Smith grieved that he felt he had been unfairly moved, Corporal Mulvaney indicates he and Lieutenant Arnold both looked into the issue. *Id.* at 2, ¶ 7. It was determined that six inmates had requested Smith's relocation. *Id.*

---

[6] Presumably S-block cell 23.
[7] Presumably P-block cell 11.
[8] In his deposition, Smith mentioned for the first-time hearing gun-shots all day long. (ECF No. 22-10 at 12). He maintains the cell was next to where county personnel engaged in target practice. *Id.* According to Smith, it was "just boom, boom, boom all day long." *Id.* This stressed him out. *Id.* Smith did not mention this in any of his grievances, or in his medical requests, or for that matter in his Complaint. Smith may not evade the exhaustion requirement by raising this issue now.
[9] Smith stated that the cell he had been placed in had toilet paper, spit, and blood on the walls. (ECF No. 22-3 at 38).

Corporal Mulvaney indicated Smith had himself requested that inmates be removed from his housing areas for similar reasons. *Id.* at ¶ 8.

Corporal Mulvaney responded to Smith's grievance on December 17th, noting that Smith had been removed from a harmful situation. (ECF No. 22-3 at 36). Corporal Mulvaney stated it was "much easier to move one person than several, and in particular at this time due to COVID." *Id.* With respect to pressing criminal charges, Smith was advised to write the Washington County Prosecutor's Office. *Id.*

Smith adamantly responded stated that it was not his job to contact the prosecutor. (ECF No. 22-3 at 37). He asserted that he had been wrongfully threatened and that the "Mexicans" were trying to run the block. *Id.* at 37-38. Smith stated that if Corporal Mulvaney would "put [him] back in [W-block]," he would guarantee he would not be harmed. *Id.* Smith insisted he did not need or want protection. *Id.* In Smith's opinion, he was being punished and Corporal Mulvaney and Lieutenant Arnold were using their authority to retaliate against him. *Id.* Smith testified Lieutenant Arnold never investigated the incident because "she's had issues against me for a long time." (ECF No. 22-10 at 8). He indicated they "bumped heads" over grievances. *Id.* A time or two, she "got rude with" him and he was rude back and "used his freedom of speech to say some choice words." *Id.* With respect to Corporal Mulvaney, Smith testified he did not "right the wrong" and that made him an "accomplice." *Id.*

Smith believed he was being punished because his privileges had been taken away. (ECF No. 22-3 at 37). In particular, Smith stated he was not allowed to talk to his family, could not watch television, and could not shower when he wanted to. *Id.* On December 17, 2020, Smith submitted a grievance reiterating that he did not need protection and would appreciate it if they would stop punishing him and using their authority to retaliate against him. (ECF No. 22-3 at

38). Corporal Mulvaney responded that the WCDC does not file charges and the final decision is up to the prosecutor's officer. *Id.* at 39. In Corporal Mulvaney's opinion, there was insufficient proof to submit charges of terroristic threatening. *Id.* Corporal Mulvaney further noted that Smith had not attempted to make a single call since December 13th; television was a privilege not a right; Smith was being given his hour out and could shower during that time. *Id.*

The following day, Corporal Mulvaney added that Smith had contacted his family, had showered on December 16th, and that if a general population area opened up for him without potential issues Smith could be moved. (ECF No. 22-3 at 40). Corporal Mulvaney stressed that Smith was not in disciplinary segregation but was in administrative segregation. *Id.* Corporal Mulvaney stated that Smith would not be going back to the housing unit he was removed from. *Id.* The exchange continued with Smith replying he had sent a text to his cousin and never said he could not shower just that his privileges had been taken away. *Id.* at 41. Smith also stated he did not have enough time to work on his lawsuit. *Id.* He continued to maintain the Defendants were incapable of performing their jobs and that the complaints against him had been lies. *Id.*

On December 18, 2020, Smith submitted a grievance staying he could not stay in the block; would be in a fight before lights out; and did not even have a place to sleep.[10] (ECF No. 22-3 at 43). Smith indicated he had done nothing to be in the hole but "I GUESS I NEED TO GIVE YOU A REASON!!!" *Id.* Sergeant Lunsford responded that "[t]hreatening, or following through, to cause trouble will only ensure your stay in [administrative segregation]." *Id.* Sergeant Lunsford again noted that Smith had been placed there for his own safety. *Id.* It was also noted that there had been several complaints about Smith stealing and starting fights. *Id.*

---

[10] In a grievance dated December 20th, Smith asserted he had to "sleep under another man[']s rack" and had no living space. (ECF No. 22-3 at 43).

On December 20, 2020, Smith stated he had not stolen anything or started a fight and if Sergeant Lunsford looked at the video for the day Smith was moved, he would see the Hispanics trying to attack him in the restroom. (ECF No. 22-3 at 43). Smith reiterated his belief that Lieutenant Arnold had an agenda against him. *Id.* He noted he should not be in administrative segregation and being forced to sleep under another man's bunk. *Id.* Smith maintained he had no living area. *Id.* Smith asserted that Sergeant Lunsford should do his job instead of acting like an idiot. *Id.* Lieutenant Arnold responded that administrative segregation was where Smith had to be housed for his own safety. *Id.* at 45.

On January 4, 2021, Smith filed this civil rights action. On January 26, 2021, Smith asked why he could not be put back into A-block. (ECF No. 22-3 at 55). Corporal Kuebler responded that Smith could not go back to A-block because in May 2020 he had "an issue with someone. Due to issues when housed together that incompatible is there." *Id.* Smith then asked the name of the inmate involved. *Id.* at 56. Corporal Sena responded that it was Hugo Castanon. *Id.*

Smith again asked why he was pulled out of W-block in December of 2020. (ECF No. 22-3 at 57). He wanted to know who had "put the pop ups on me in W." *Id.* He complained he had been forced to leave W-block and put in twenty-three hour a day lock-down. *Id.* Corporal Mulvaney responded by asking if this was the issue Smith had filed the civil rights action on. *Id.* Smith responded it was and objected to Corporal Mulvaney responding to his grievance since he was a Defendant. *Id.* at 57-58. Corporal Mulvaney responded that he would notify personnel that neither he nor Lieutenant Arnold should be answering anything submitted by Smith. *Id.* at 58. After his nearly two-month stay in W-block, Smith was reassigned to an open barrack and "[e]verything [was] nice and calm and hunky-dory." (ECF No. 22-10 at 14).

According to Corporal Mulvaney, the WCDC was designed so inmates could be separated according to existing laws and regulations and the facility's classification plan. (ECF No. 22-1 at 2, ¶ 9). Every detainee is classified when booked into the facility and is to be housed according to that classification. *Id.* at ¶ 10. The classification system considers the detainee's criminal charge, his history, and any other security issues such as known enemies or co-defendants in the facility. *Id.* at 4, ¶ 21; *see also* (ECF No. 22-6 at 1-3 (classification policy)). Corporal Mulvaney remarked that "[i]t would be unusual for higher-ranking officers at the [WCDC] to be aware of housing or classification issues unless the issue was systemic or could not be resolved by the chain of command assigned to make housing determinations." *Id.* at 4, ¶ 20.

Corporal Mulvaney stated that due to constant occupancy and traffic in the detention center, it is important for both detainees and detention personnel to follow guidelines to prevent the spread of contagious disease. (ECF No. 22-1 at 3, ¶ 13). It is the detention center's policy to take precautions to identify and prevent the spread of contagious disease. *Id.*

Corporal Mulvaney asserts it is the policy of the WCDC to maintain a clean and healthy environment through daily hygiene and sanitation practices. (ECF No. 22-1 at 3, ¶ 14). All cleaning supplies are used to manufacturers specifications. *Id.* Detainees are responsible for keeping themselves and their quarters clean and in order. *Id.* Staff makes "irregular" visual inspection of the facility throughout the day and corrective measures are taken immediately whenever possible. *Id.*

By affidavit Lieutenant Arnold indicates she did not make the December 15, 2020, decision to move Smith from W-block. (ECF No. 22-11 at 1). Instead, she indicates the decision was made by Sergeant Lewis and she merely responded to Smith's grievances about the move. *Id.*

Lieutenant Arnold indicates she did not investigate the allegations made against Smith because he was not charged with a violation of any rules or laws. *Id.*

According to Lieutenant Arnold, "[i]f officers receive credible warnings of actions against an inmate, it is the practice at the [WCDC] to move the fewest inmates necessary to avoid any attacks. If the risk appears to be isolated to one inmate, that inmate would be moved to protect him/her." (ECF No. 22-11 at 2). Due to Smith's sex offender status, housing restrictions due to problems with other inmates, and COVID quarantines and isolation during the pandemic, housing availability was limited. *Id.* Policy allows an inmate to be housed in administrative segregation until a safe housing location is available. *Id.*

Lieutenant Arnold indicates inmates on administrative segregation have all the privileges of inmates in general population. (ECF No. 22-11 at 2). She is aware of instances when an inmate may be required to sleep on the floor on a mat when a bunk is not available. *Id.* However, she is not aware of any situation in which an inmate has been forced to sleep under another inmate's bunk. *Id.*

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

Defendants have moved for summary judgment arguing that: (1) there is no proof of personal involvement by the Defendants in the decision to move Smith on December 15, 2020; (2) Smith was not housed in unconstitutional conditions of confinement; (3) Smith was moved for his own protection and due process was not required; (4) Defendants are entitled to qualified immunity; and (5) there is no basis for official capacity liability.

#### A. Personal Involvement

Liability under § 1983 requires personal involvement in the constitutional violations. *Ashcroft v. Iqbal*, 566 U.S. 662, 676 (2009) (a plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights"). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes,* 21 F.3d 277, 280 (8th Cir. 1994).

Defendants correctly assert that to be held liable under § 1983 they must have been personally involved in the alleged constitutional deprivation. While the record appears to be clear that neither Lieutenant Arnold nor Corporal Mulvaney were involved in the initial decision to move Smith, they were both involved in responding to Smith's grievances asserting that his rights were violated by the move and that no investigation had been done. Supervisors can "incur liability . . . when their corrective inaction amounts to deliberate indifference or tacit authorization of the violative practices." *Choate v. Lockhart,* 7 F.3d 1370, 1376 (8th Cir. 1993); *Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir. 1987)("when supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates"); *Cf. Langford v. Norris,* 614 F.3d 445, 460-61 (8th Cir. 2010)(when constitutional duty to provide medical care goes unfulfilled, if administrator knew that inmate's "serious medical needs were not being adequately treated yet remained indifferent, he may be held personally liable"). Additionally, Defendants had direct knowledge of Smith's complaints about the conditions under which he was confined and responded to the same. Defendants are not entitled to summary judgment on this ground. The Court believes that there is a sufficient, albeit slim, basis for supervisory liability to exist which requires an analysis of the merits of Smith's claims.

### B. Unconstitutional Conditions of Confinement

The question before the Court is whether the conditions Smith was subjected to following his move from W-block violated the Eighth Amendment. As noted, Smith was in convicted status at this time.

### 1. Eighth Amendment Standard

The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids prison conditions that involve the "unnecessary and wanton infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)(citations omitted). Prison officials are required to provide adequate food, clothing, and shelter. *Butler v. Fletcher,* 465 F.3d 340, 345 (8th Cir. 2006). The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102 (1976).

To establish an Eighth Amendment violation, Smith must prove both an objective and subjective element. *Revels v. Vincenz,* 382 F.3d 870, 875 (8th Cir. 2004)(citation omitted). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner." *Id.*

### 2. Individual Capacity Claim

Smith maintains his privileges were taken away when he was removed from W-block. This includes no longer being able to watch television, or use fellow inmates' phone privileges, or use the phone during convenient hours, or the ability to shower at his convenience. (ECF No. 22-10 at 13). Smith testified he was forced to shower, use the kiosk, exercise, and do the paperwork for his lawsuits in just one hour a day, and only got to go outside a single time. *Id.* In short, the move "pretty well just much messed up my everyday, normal life for something that I did not even do." *Id.*

While Smith preferred being housed in W-block, there is a fundamental difference between depriving an inmate of more comfortable living conditions and depriving an inmate of the basic necessities of life with which the Eighth Amendment is concerned.  "[E]xtreme deprivations are required to make out a conditions-of-confinement claim.  [O]nly those deprivations denying the minimal of civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  While the conditions in P11 were more restrictive than those in W-block, the restrictive nature of the conditions clearly do not violate the Eighth Amendment, which is concerned with the basic concepts of humanity and decency.  In other words, the adverse impact on Smith's every-day life does not remotely amount to the type of deprivation required to violate the Eighth Amendment.

From his deposition testimony, it is clear Smith remained in a "filthy" holding cell, HC3- a cell-in booking that had been partially cleaned up-for only about two hours.  (ECF No. 22-10 at 6).  He was then moved to cell four, HC4, which he described as "just filthy" with blood and spit on the walls and dirt all over the floor.  *Id.*  Smith also believed detainees coming into the facility, who may have had COVID 19, were held in that cell, and it had not been cleaned.  *Id.*  Smith remained in this cell for one to two hours.  *Id.*  According to Defendants' records, Smith was offered cleaning supplies during this time and Deputy Weaver assisted in cleaning the cell.  (ECF No. 22-5 at 6). The shortness of Smith's stays in HC3 and HC4 and the provision of cleaning supplies belie the existence of an Eighth Amendment claim.

Smith was then moved to S23 where he believes he should have been housed in the beginning and he remained there for two to three days.  (ECF No. 22-10 at 6).  Smith voiced no objections to the conditions in S23.  Smith was then moved to P11 where he stayed for approximately two months; Smith alleges he slept on the floor there for over a month.  *Id.* at 8.

While is not necessarily unconstitutional to have an inmate sleep on the floor, *see e.g., Ferguson v. Cape Girardeau Cnty.*, 88 F.3d 647, 650 (8th Cir. 1996) (use of a floor mattress for thirteen nights not unconstitutional), consideration must be given to the totality of the circumstances including the length of time the inmate is forced to sleep on the floor and the health of the inmate. *See e.g., A.J. by L.B. v. Kierst*, 56 F.3d 849, 855 (8th Cir. 1995)(sleeping on mattresses on the floor not unconstitutional when it was for only a relatively short period of time and then only when there was a special need); *see also Hubbard v. Taylor,* 538 F.3d 229 (3d Cir. 2008)(having to sleep on the floor for three to seven months was not excessive). Here, Smith alleges he slept on the floor for over a month. He contends the Defendants were aware that he had a "bottom rack script" because of his back problems. (ECF No. 22-10 at 8-9). During this time, Smith had a mattress, a blanket, a soft back brace, and a second blanket to ease his back pain.

Smith also complains that he had to sleep partially under another inmate's bunk causing increased back pain as well as pain in his knee due to it hitting or being pinched by the metal brace under the bunk. Smith maintains he had to sleep in this manner because of the lack of space in the cell. Smith provided a hand drawn diagram of the cell. (ECF No. 24 at 4). While the cell is small, it is not clear that Smith was precluded from arranging his mat so that he was not partially under another inmate's bunk. With respect to his back pain, Smith indicated his back pain was exasperated when sleeping on a metal bunk, on a mat on the floor, sitting on a hard surface, standing, or walking for any length of time. (ECF No. 22-4 at 17 & 23). Thus, it was the hardness of the surface, rather than the fact that he slept on a mat on the floor, that increased his back pain.

Smith makes no allegation that he was denied bedding or clothing or was exposed to extreme temperatures. He does not allege he was forced to sleep on a dirty floor, or one containing human waste, or subjected to other unsanitary conditions. *See Beaulieu v. Ludeman*, 690 F.3d

1017, 1045 (8th Cir. 2012)("Conditions, such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or month"); *Owens v. Scott Cnty. Jail,* 328 F.3d 1026, 1026-27 (8th Cir. 2003)(reversing summary judgment for jail officials where detainee slept on a floor mattress next to a toilet for five weeks, urine splashed onto detainee and his bedding, and bedding was cleaned less than once a month). Smith concedes inmates were provided with cleaning supplies and were responsible for cleaning their own cells. (ECF No. 22-3 at 7, 18-21). The Court finds there is no genuine issue of material fact as to whether the conditions Smith was housed under violated the Eighth Amendment—they did not.

### 3. Qualified Immunity

Defendants also contend they are entitled to qualified immunity. "Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986)).

The qualified immunity inquiry consists of two questions: "(1) whether the facts alleged or shown, construed in the light most favorable to the Plaintiff, establish a violation of a constitutional right; and (2) whether that constitutional right was clearly established as of the time of the relevant conduct such that a reasonable official would have known that his actions were unlawful." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (citation omitted). The Court can answer the questions in either order. *Pearson v. Callahan,* 555 U.S. 223, 242 (2009). A § 1983 plaintiff may defeat qualified immunity only if the answer to both questions is yes. *Boude v. City of Ramore*,

15

855 F.3d 930, 933 (8th Cir. 2017) (citation omitted). Having found no constitutional violation exists as to Smith's unconstitutional conditions of confinement claims, Defendants are entitled to qualified immunity. *See e.g., Kulkay v. Roy*, 847 F.3d 637, 646 (8th Cir. 2017) (finding individual defendants entitled to qualified immunity when plaintiff failed to state a constitutional violation).

### 4. Official Capacity Claim

A suit against an employee in his or her official capacity is tantamount to an action directly against the employing governmental entity. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989). In other words, it is a suit against Washington County. *Kentucky v. Graham,* 473 U.S. 159, 165 (1985). "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence, Mo.,* 829 F.3d 695, 699 (8th Cir. 2016)(citations omitted).

When asked to describe his official capacity claim, Smith responded that Washington County put multiple inmates in cells with insufficient room and forced people to sleep on the floors. (ECF No. 22-10 at 9). For example, Smith testified that cell P11 was a "very little" three-person cell yet four-men were assigned to it. *Id.* at 6 & 9. Smith does not know if this was done because of the jail population or for some other unrelated reason. *Id.* He believed it was "just because they can, because they could." *Id.*

To establish the existence of an unconstitutional policy, Smith must point to "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Further, "there must be an affirmative link or causal connection between the policy and the particular

16

constitutional violation alleged." *Clay,* 815 F.2d at 1170. Smith's amorphous allegations are insufficient to suggest the existence of an unconstitutional policy.

The next method of establishing municipal liability is through the existence of an unofficial custom:

> [A] plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Corwin*, 829 F.3d at 700 (citation and internal quotation marks omitted). Smith's assertions fall far short of establishing the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct, notice to the officials of such conduct, or that such custom was the moving force behind the alleged constitutional violation.

The final method to establish Washington County's liability is by establishing the failure to train or supervise the offending actors who caused the deprivation. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010). With respect to a failure to train claim, the County may be subject to liability for the inadequate training of its employees where: "(1) the [County's] . . . training practices [were] inadequate; (2) the [County] was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by [the County]; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury." *Id.* (citation and internal quotation marks omitted). To satisfy this standard, Smith must demonstrate "that in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of [Washington County] can reasonably be said to have

been deliberately indifferent to the need." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390 (1989). Smith's claims do not demonstrate that Washington County had notice that its training was inadequate and likely to result in a violation of constitutional rights. *Andrews v Fowler,* 98 F.3d 1069, 1076 (8th Cir. 1996). For these reasons, there is no basis on which Washington County can be held liable.

### C. Due Process Claim

Smith's due process claim is based on his December 15, 2020, removal from W-block and his placement in administrative segregation following the submission of grievances from six inmates asking for his removal from the pod. Smith maintains Defendants should have followed proper procedure and investigated the grievances before he was moved. (ECF No. 22-10 at 13). As noted, Smith was in convicted status.

#### 1. Fourteenth Amendment Standard

To prevail on a Fourteenth Amendment due process claim, a prisoner "must first demonstrate that he was deprived of life, liberty, or property by government action." *Phillips v. Norris,* 320 F.3d 844, 846 (8th Cir. 2003). As Smith is not claiming a deprivation of life or property, he must identify a liberty interest in connection with his claim. *Id.* A convicted inmate must be afforded due process only when the "punitive" isolation amounts to an "atypical and significant" hardship. *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). The Eighth Circuit has "consistently held that administrative and disciplinary segregation are not atypical and significant hardships under *Sandin*." *Portly-El v. Brill,* 288 F.3d 1063, 1065 (8th Cir. 2002). *See also Orr v. Larkins,* 610 F.3d 1032, 1034 (8th Cir. 2010)(inmate was not deprived of liberty interest during nine months of administrative segregation); *Kennedy v. Blankenship,* 100 F.3d 640, 642-43 (8th Cir. 1996)(30 days of punitive confinement, including restrictions on mail, visitation, commissary,

and other privileges, is not an atypical and significant deprivation). Additionally, prisoners do not have a liberty interest in being housed in, or transferred to, any particular prison unit. *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983).

### 2. Individual Capacity Claim

Here, Smith was moved to administrative segregation based on the grievances submitted by other inmates stating he was causing problems in the unit and suggesting "something" would happen to Smith if he remained in the pod. The grievances are part of the record and Smith does not deny they were submitted. Instead, he contends the inmates were liars and/or altered their positions after the grievances were submitted.

The Supreme Court in *Sandin* made clear that a convicted prisoner does not have a right to procedural due process in connection with temporarily being placed in administrative segregation. *Sandin,* 515 U.S. at 486-87. The summary judgment record is replete with evidence that the decision to place Plaintiff in administrative segregation was not a disciplinary matter, or punishment for the crimes of which he was charged. On the contrary, it was an administrative strategy designed to preserve order in the prison and protect the safety of all inmates. Defendants are entitled to summary judgment on the individual capacity claims against them.

### 3. Qualified Immunity

Having found no constitutional violation exists as to Smith's due process claim, Defendants are entitled to qualified immunity. *See e.g., Kulkay*, 847 F.3d at 646. Further, as set forth in *Sandin* and its progeny, it was clearly established in December of 2020 that Smith, a convicted inmate, was entitled to no procedural due process for being temporarily moved to administrative segregation for his safety and the security of the facility.

### 4. Official Capacity Claim

With respect to his official capacity claim, Smith testified that he knew that "any other time anything has happened," officers pulled inmates out in the hallway to "talk to" them about the accusation. (ECF No. 22-10 at 14). According to Smith, he is "[t]he only person I've ever seen snatched up and jerked out of there." *Id.* With everyone else, Smith testified there had been a "small investigation." In other words, Smith claims that the policy of the WCDC was violated by the way he was handled. He makes no argument the policy itself was unconstitutional or was the motivating force behind his alleged constitutional violation. Thus, the Court finds no basis for official capacity liability.

### IV. CONCLUSION

For these reasons, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED, and this case be DISMISSED WITH PREJUDICE.**

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 16th day of August 2021.

/s/ *Christy Comstock*
HON. CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE